2012 VT 90

## State of Vermont v. Nicholas Spooner

[60 A.3d 640]

No. 11-312

Present: **Reiber, C.J., Dooley, Skoglund and Burgess, JJ., and Zonay, Supr. J., Specially Assigned**

Opinion Filed October 19, 2012

*Michael Kainen*, Orange County Deputy State's Attorney, Chelsea, for Plaintiff-Appellant.

*Matthew F. Valerio*, Defender General, *Anna Saxman*, Deputy Defender General, and *Robert Reagan*, Legal Intern, Montpelier, for Defendant-Appellee.

¶ 1. **Reiber, C.J.** The State of Vermont appeals from the trial court's dismissal of a civil driver's license suspension complaint. The trial court found that the statutory requirements for civil suspension had not been met. We affirm.

¶ 2. The following facts are uncontested. On April 30, 2011, at 11:51 p.m., defendant was stopped in Newbury by Vermont State Trooper David Shaffer after ignoring a "Road Closed — High Water" sign and crossing a flooded roadway. Trooper Shaffer, smelling alcohol, asked defendant to perform a preliminary breath test and field sobriety tests. Based on the results of those preliminary tests, defendant was taken to the Bradford Police Department, where Trooper Shaffer performed a series of breath tests with the station's DataMaster DMT blood-alcohol-content-measurement device.[1]

¶ 3. At 1:51 a.m., Trooper Shaffer obtained a reading of .101 from the first DMT test. Defendant requested a second test. At 1:52 a.m., the DMT device returned a reading of "standard out of range." Trooper Shaffer attempted to perform a third test, but received a report of "invalid sample" at 1:59 a.m. On the fourth try, at 2:01 a.m., the DMT reported a blood-alcohol content of

---

[1] Trooper Shaffer took defendant to the Bradford Police Department, rather than the Bradford State Police Barracks, where Trooper Shaffer is based, because the DMT at the state police barracks was out of order.

.109. Defendant was informed of his right to obtain an independent test.

¶ 4. Defendant was processed for driving while under the influence, and the State sought civil suspension of defendant's license. On August 3, 2011, a final civil suspension hearing was held pursuant to 23 V.S.A. § 1205(h). At the hearing, defendant argued primarily that the statutory requirements for civil suspension had not been met. In particular, defendant raised the following issues: (1) whether valid and reliable testing methods were used and whether the results of the tests were accurate and accurately evaluated, and (2) whether the requirements of 23 V.S.A. § 1202 were satisfied. Most specifically, defendant contended that he did not receive the statutorily permitted second test under § 1202(d)(5), which allows a motorist who submits to an evidentiary breath test to "elect to have a second infrared test administered immediately after receiving the results of the first test." Defendant argued that the second test was invalid because it was not taken in compliance with the testing procedure adopted by the Vermont Criminal Justice Training Council and the Vermont Department of Health in the DataMaster DMT Addendum to its breath testing manual.

¶ 5. The manual, which dictates the proper operating procedures for DMT testing, specifies that DMT devices can experience fatal and nonfatal errors. Nonfatal errors are those that "may be remedied by the test operator," and once "the error has been cleared," the testing procedure can be resumed. When a fatal error occurs, however, the manual provides that the DMT should be designated "out of service" and a detailed message should be left for the DMT supervisor. The manual states that a report of "standard out of range" is a fatal error. After receiving a fatal error, the manual instructs that the officer should "proceed to a different DataMaster," and, "[i]f another DataMaster is not reasonably available, blood may be drawn." The manual's stated objective is for police officers to operate the DMT machine "in accordance with the specified procedure incorporated in this training."

¶ 6. At the final merits hearing, the State presented testimony from its forensic chemist, Amanda Bolduc. Ms. Bolduc testified that she believed that the DMT device was "functioning properly at the time of the test[s]" and that there was no reason to doubt the reliability of the result obtained from the successive test effort

that yielded the .109 BAC. Although the manual indicates that a machine should be taken out of service following the receipt of a fatal error, such as a "standard out of range" reading, Ms. Bolduc opined that if an officer tries the device again and it gives a valid reading, "it's fine." She noted that the Department of Health's manual uses the word "should" not "must" when describing the procedures to follow after obtaining a "standard out of range" reading. During cross-examination of Ms. Bolduc, defendant sought to cast doubt on the reliability of the majority of DMT machines and the validity of their test results, questioning Ms. Bolduc about her own expressed frustration with the devices, their malfunctions and glitches, and in particular, her dissatisfaction with one device that emitted plumes of smoke when turned on.

¶ 7. In a memorandum of law submitted after the final hearing, the State contended that Ms. Bolduc's testimony established that the testing methods complied with the Department of Health's rules. As a result, the State maintained, the testing methods and results were entitled to a presumption of validity, reliability, and accuracy.

¶ 8. The trial court dismissed the State's contention that use of the term "should" in the Department of Health's manual allowed the officer to exercise his own discretion with respect to the testing procedure. The court determined that the State did not comply with its own testing procedures and that this failure to adhere to the protocol deprived defendant of a valid and reliable second test as required by § 1202. Noting that the civil-suspension statute requires compliance with the testing statute, the trial court found the State had failed to adequately establish the elements necessary for the civil suspension and dismissed the complaint. The State appealed.

¶ 9. The State urges two primary grounds for reversal. First, the State argues that the officer's failure to administer the second breath test in compliance with the State's own training manuals is insufficient grounds to deem the second test unreliable, and thus inadmissible. The court cannot, the State maintains, "exclude" breath-test results based on the "mere possibility" of inaccuracy. Second, the State contends that the first breath test was reliable — notwithstanding the later nonfatal and fatal error messages — and was, in and of itself, sufficient to sustain a civil suspension of the defendant's license. Neither argument is availing.

¶ 10. As a threshold matter, we note that the trial court predicated its dismissal of the civil-suspension complaint not on the admission or exclusion of any breath-test evidence but rather on the State's failure to comply with every element of the civil-suspension regime. The trial court found that the trooper's departure from the Department of Health's operating protocol undermined the reliability of the later breath test effort that yielded a BAC result. That irregularity, the court reasoned, deprived defendant of a statutory right to a valid and reliable second test, negating an element necessary to sustain the State's civil complaint.

¶ 11. The trial court's determinations represent both findings of fact and conclusions of law, which we analyze according to their respective standards of review. Under the civil-suspension statute, a trial court is expressly authorized to consider the reliability of testing procedures and the accuracy of results. See § 1205(h)(1)(D) (final-hearing issues include "whether the testing methods used were valid and reliable, and whether the test results were accurate and accurately evaluated"). Whether a test is reliable or accurate is a factual finding. We review the trial court's factual finding for clear error, "recognizing that the trier-of-fact is in the best position to determine the weight and sufficiency of the evidence presented." *State v. Santaw*, 2010 VT 111, ¶ 6, 189 Vt. 546, 12 A.3d 548 (mem.).

¶ 12. The trial court's assessment of the tests' reliability necessarily involved an assessment of the credibility of Ms. Bolduc's testimony. Ms. Bolduc testified that if a fatal error occurs during an officer's administration of a DMT breath test, the officer may try another test, and if the machine works during that test, "it's fine." This testimony contradicted the Department of Health's manual, which provides that, in the event of a fatal error, the machine should be taken out of service, presumably because the machine did not operate properly. Because credibility determinations are solely within the province of the fact finder, *Omega Optical, Inc. v. Chroma Tech. Corp.*, 174 Vt. 10, 20-21, 800 A.2d 1064, 1071 (2002), the court did not err in choosing to discredit Ms. Bolduc's testimony where it directly contradicted the State's own training manual. The court properly grounded its decision that the second test to actually yield a result was not conducted in a valid or reliable manner in accord with a methodology

prescribed by the Department of Health. The finding is supported by the record below and is not clearly erroneous.

¶ 13. It is true, as the State points out, that "[e]vidence that the test was taken and evaluated in compliance with rules adopted by the department of health shall be prima facie evidence that the testing methods used were valid and reliable and that the test results are accurate and were accurately evaluated." § 1205(h) (1)(D).[2] Here, however, the second successful test was definitively *not* conducted in compliance with the State's own procedures. Where an officer does not comply with operating procedures, the fact finder is free to find the converse of that presumption.

¶ 14. On appeal, the State also argues that the validity of the second test's results was immaterial because the first breath test was reliable and therefore sufficient on its own to sustain a civil suspension. The trial court found that a reliable second test was a necessary element of the civil-suspension procedure that the State failed to establish. We review such a conclusion of law de novo. See e.g., *State v. Therrien*, 2011 VT 120, ¶ 9, 191 Vt. 24, 38 A.3d 1129 ("The interpretation of a statute is a question of law that we review de novo."). In interpreting statutory language, "if the plain language is clear and unambiguous, we enforce the statute according to its terms." *Id.* (citation omitted). We also have recognized that "legislative intent is most truly derived from a consideration of not only the particular statutory language, but from the entire enactment, its reason, purpose and consequences." *State v. Robitaille*, 2011 VT 135, ¶ 12, 191 Vt. 91, 38 A.3d 52 (quotation omitted).

¶ 15. Under Vermont law, a civil suspension is a summary proceeding designed to rapidly remove potentially dangerous drivers from public roadways. *State v. Anderson*, 2005 VT 80, ¶ 3, 179 Vt. 43, 890 A.2d 68; *State v. Strong*, 158 Vt. 56, 61, 605 A.2d 510, 513 (1992) ("The summary suspension scheme serves the rational remedial purpose of protecting public safety by quickly removing potentially dangerous drivers from the roads."). Under

---

[2] At the time this case was initiated, the Department of Health was responsible for promulgating the rules governing use of the DMT devices. Section 1205(h)(1)(D) now provides that the Department of Public Safety is responsible for the rules' adoption. See 2011, No. 56, § 16, effective March 1, 2012.

the civil-suspension statute, an officer issues a notice of intention to suspend when an evidentiary blood-alcohol test yields a measurement in excess of the legal limit. § 1205(c). In addition to a preliminary hearing, a defendant may request a final hearing to review the merits of the suspension. § 1205(h)(1). At the final hearing, a judge is permitted to consider only a narrow range of statutorily-prescribed issues. § 1205(h)(1)(A)-(E). Among those limited issues a judge must consider are whether the testing methods used to establish a driver's blood-alcohol content were valid and reliable. § 1205(h)(1)(D). The judge also must determine whether the State complied with the requirements of the blood-alcohol-testing statute, § 1202. See § 1205(h)(1)(E). Under the testing statute, "[a] person . . . may elect to have a second infrared test administered immediately after receiving the results of the first test." § 1202(d)(5). The second test serves the obvious purpose of verifying the accuracy of the first. As the trial court observed, this second test must necessarily be as reliable as the first in order for it to serve this function. Thus, read in light of one another, § 1205(h)(1)(D)-(E) and § 1202(d)(5) dictate that if a person elects to have a second test, the methods of that test are reviewable for validity and reliability by the court at a final civil-suspension hearing.

■■ ¶ 16. The State contends that the existence of a first, valid and reliable test is sufficient for civil suspension. To accept this assertion would render portions of both the testing statute and the civil-suspension review procedures meaningless. See 23 V.S.A. § 1205(h)(1)(E) (permitting final-hearing review of compliance with § 1202). "Generally, we do not construe a statute in a way that renders a significant part of it pure surplusage." *In re Lunde*, 166 Vt. 167, 171, 688 A.2d 1312, 1315 (1997) (quotation omitted). The civil-suspension statute clearly calls on the trial judge to review both the reliability of any evidentiary tests conducted and compliance with § 1202. Section 1202, as we have observed, affords a person a right to a second test, which must be conducted in a reliable fashion. If a court finds that the second test was conducted in an unreliable fashion, the State has necessarily failed to carry its burden to establish compliance with § 1202, and the court must then deny the civil suspension of a defendant's license.

■ ¶ 17. On appeal, the State relies on a series of criminal drunk-driving cases dealing with the admissibility of blood-alcohol

test results. This reliance is misplaced. Although the cases the State cites do relate to the validity and reliability of evidentiary breath tests, they do so in a different context not directly implicated in this case. The State puts particular emphasis, for example, on *State v. Vezina*, 2004 VT 62, 177 Vt. 488, 857 A.2d 313 (mem.), in which we declined to require suppression of evidence from a first breath test in a criminal drunk-driving case simply because a second test was not administered in accordance with state procedures and testing law. In *Vezina*, a valid second test was not an element of the criminal drunk-driving charge the State sought to prove. See 23 V.S.A. § 1201(a) ("A person shall not operate, attempt to operate, or be in actual physical control of any vehicle on a highway: (1) when the person's alcohol concentration is 0.08 . . . ; or (2) when the person is under the influence of intoxicating liquor."). In the present case, however, statutory compliance was, as the trial court correctly found, an element the State had the burden to establish to prevail in its civil-suspension complaint. See § 1202(d)(5); § 1205(h)(1)(E). That is to say, unlike in *Vezina*, the issue here is not the admissibility of either breath test. Nor is the question the validity of the first test; the issue is the absence of a sufficiently reliable second test.

¶ 18. In sum, the trial court's factual findings regarding the unreliability of the second test were not clearly erroneous, and the court correctly concluded that the lack of a reliable second test deprived the State of an essential element to establish its civil-suspension case.

*Affirmed.*